

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JAN 29 2002

JAMES W. McCORMACK, CLERK
By:_____
                          DEP CLERK

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICTS OF ARKANSAS
### WESTERN DIVISION

**DR. JEFFREY RAINBOLT, M.D.**                              **PLAINTIFF**

CIVIL ACTION NO. 4 - 0 2 - C V - 0 0 0 5 0 ̶G̶H̶

**UNIVERSITY OF ARKANSAS FOR MEDICAL SCIENCES;**          **DEFENDANTS**
**(UAMS) by and through its Board of Trustees of the University**
**of Arkansas, a body Politic and Corporate, J. THOMAS**
**"TOMMY" MAY, In his Official capacity as Chairman,**
**WILLIAM E. "BILL" CLARK,  In his Official capacity**
**as Vice-Chairman, FRANCES A. CRANFORD, In her**
**Official capacity, JAY DICKIE, In his Official capacity,**
**GARY C. GEORGE, In his Official capacity, JOE L.**
**HARGROVE, In his Official capacity, TIM E. HUNT,**
**In his Official capacity, JAMES E. "JIM" LINDSEY,**
**In his Official capacity, STANLEY E. REED, In his**
**Official capacity, CHARLES E. SCHARLAU III, In**
**his Official capacity;**

This case assigned to District Judge _Howard_
and to Magistrate Judge _Forster_

**B. ALLEN SUGG, In his Official capacity as the President**
**of the University of Arkansas;**

**DR. HARRY P. WARD, M.D., In his Official capacity as**
**the former Chancellor of UAMS;**

**DR. DODD WILSON, M.D., In his Official capacity as**
**the current Chancellor of UAMS and former Dean of**
**the College of Medicine;**

**DR. KEVIN MEANS, M.D., In his Individual and Official capacity**
**as the Chairman of the Department of Physical Medicine and**
**Rehabilitation and its Residency Program of the UAMS;**

**DR. DAVID NEALE, M.D., In his Individual and Official**
**capacity as a member of the resident selection**
**committee of the UAMS Department of Physical**
**Medicine and Rehabilitation;**

**DR. FLORIAN KEPLINGER, M.D., In her Individual**
**and Official capacity as a member of the resident selection**



DOCUMENT
NUMBER
1

JAMES W. McCORMACK

**committee of the UAMS Department of Physical
Medicine and Rehabilitation;**

**DR. ALICE FANN, M.D., In her Individual and Official
capacity as a member of the resident selection committee
of the UAMS Department of Physical
Medicine and Rehabilitation;**

**DR. JAGDISH KARAMCHANDANI, M.D., In his Individual
and Official capacity as a member of the resident selection
committee of the UAMS Department of Physical
Medicine and Rehabilitation;**

**DR. JENNESS COURTNEY, M.D., In her Individual and Official capacity
as a member of the resident selection committee of the
UAMS Department of Physical Medicine and Rehabilitation;**

## COMPLAINT

Comes Dr. Jeffrey Dale Rainbolt, M.D., through his attorneys, Zachary David Wilson,

P.A., and for his Complaint states the following:

**I.     PARTIES**

1.      Dr. Jeffrey Dale Rainbolt, (Plaintiff) herein, is a male Caucasian citizen of the

United States and the state of Arkansas who resides at Highway 27 South, P.O. Box 1009,

Marshall, Arkansas 72650. Plaintiff has resided in Marshall, Arkansas for over 14 years.

Plaintiff has been licensed and has been practicing medicine for over 14 years. Plaintiff, Dr.

Rainbolt is in good standing with the State of Arkansas Medical Board and has never had a

medical malpractice claim brought against him in any court of the United States. A copy of Dr.

Rainbolt's verification of good standing is attached hereto as Exhibit 1.

2.      Named as Defendants in this proceeding are: The University of Arkansas for

Medical Sciences (UAMS), by and through its Board of Trustees of the University of Arkansas.

UAMS is a governmental entity subject to suit under Title VII, and for violating federally

protected rights pursuant to 42 U.S.C. §1983. The Board of Trustees of the University of

Arkansas is the governing body for the University of Arkansas, including UAMS, and may be served with process by serving the Chairman of the Board, J. Thomas May, and its President, B. Alan Sugg, at 2404 North University Ave., Little Rock, Arkansas 72207. The following defendants are being sued in their official capacity only as representatives of UAMS and in their supervisory capacity under the theory of Respondent Superior: J. Thomas "Tommy" May, Chairman; William E. "Bill" Clark, Vice-Chairman; Frances A. Cranford; Jay Dickie; Gary C. George; Joe L. Hargrove; Tim E. Hunt; James E. "Jim" Lindsey; Stanley E. Reed; Charles E. Scharlau III;

3.      Defendant Dr. Harry P. Ward, M.D., was at all material times the Chancellor of UAMS, now former Chancellor. He is sued in his official capacity and can be served with process at 4301 W. Markham, Little Rock, Arkansas 72205-7199.

4.      Defendant Dr. Dodd Wilson, M.D., is the current Chancellor of UAMS. He is sued in his official capacity and can be served with process at 4301 W. Markham, Little Rock, Arkansas 72205-7199.

5.      Defendant Dr. Kevin Means, M.D., was at all material times the Chairman of the Department of Physical Medicine and Rehabilitation and its Residency Program. He is sued in his individual and official capacity and can be served with process at 4301 W. Markham, Little Rock, Arkansas 72205-7199.

6.      Defendant Dr. David Neale, M.D., was at all material times a member of the resident selection committee. He is sued in his individual and official capacity and can be served with process at 2200 Ft. Roots Dr., 117 N.L.R., VAMC PM and RS, North Little Rock, Arkansas, 72205-7199.

7.     Defendant Dr. Florian Keplinger, M.D., was at all material times a member of the resident selection committee. She is sued in her individual and official capacity and can be served with process at 4301 W. Markham, Little Rock, Arkansas 72205-7199.

8.     Defendant Dr. Alice Fann, M.D., was at all material times a member of the resident selection committee.  She is sued in her individual and official capacity and can be served with process at 4301 W. Markham, Little Rock, Arkansas 72205-7199.

9.     Defendant Dr. Jagdish Karamchandani, M.D., was at all material times a member of the resident selection committee. He is sued in his individual and official capacity and can be served with process at 4301 W. Markham, Little Rock, Arkansas 72205-7199.

10.     Defendant Dr. Jenness Courtney, M.D., was at all material times a member of the resident selection committee.  She is sued in her individual and official capacity and can be served with process at 2120 Bert Kouns, Suite C, Shreveport, LA, 71118.

## II.     JURISDICTION

11.     This is an action at law and in equity to redress the deprivation, under color of statute, custom or usage of rights, privileges, and immunities secured to Plaintiff under the provisions of Title VII of the Civil Rights Act, 42 U.S.C. §§ 1981a, 1983, 1985(3), 1997d, 2000c-8 and 2000e-2, the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, the Fourteenth Amendment to the United States Constitution, the laws of the state of Arkansas, specifically the Arkansas Civil Rights Act, Intentional Infliction of Emotional Distress/Outrage, Interference with Employment, and for attorneys' fees under 42 U.S.C. § 1988 and the Arkansas Civil Rights Act.  These statutes apply to suits based on discrimination of individuals due to their race, national origin and sex.  Plaintiff asserts, set forth in more detail below, that he was discriminated against by Defendants solely due to his race, national origin and sex in seeking

admission to the residency program offered by UAMS as administered by Defendants Dr. Kevin

Means, Dr. David Neale, Dr. Florian Keplinger, Dr. Alice Fann, Dr. Jagdish Karamchandani, Dr.

Jenness Courtney as members of the Physical Medicine and Rehabilitation (PM&R) resident

selection committee (RSC).

12.     Plaintiff seeks damages for the injuries caused by Defendants' actions, as well as

equitable, declaratory and injunctive relief.

13.     Jurisdiction for Federal claims is specifically founded on 28 U.S.C. §§ 1331 and

1343. 28 U.S.C. § 1331  provides:

> The district courts shall have original jurisdiction of all civil action
> arising under the Constitution, laws, or treaties of the Unites States.

28 U.S.C. §1343 provides:

> The district courts shall have original jurisdiction of any civil action
> authorized by law to be commenced by any person: (1) To recover
> damages for injury to his person or property, or because of the
> deprivation of any right or privilege of a citizen of the United States,
> by any act done in furtherance of any conspiracy mentioned in section
> 1985 of Title 42; . . .(3) To redress the deprivation, under color of any
> State law, statute, ordinance, regulation, custom or usage, of any right,
> privilege or immunity secured by the Constitution of the United States
> or by any Act of Congress providing for equal rights of citizens or of all
> persons within the jurisdiction of the United States; (4) To recover damages
> or to secure equitable or other relief under any Act of Congress providing
> for the protection of civil rights, including the right to vote.

This suit is based on the federal laws, including civil rights laws enumerated above in paragraph

11. Jurisdiction is therefore proper as a federal question and under federal civil rights laws.

Plaintiff also invokes this Court's pendent jurisdiction over the Arkansas state law claims

pursuant to 28 U.S.C.§ 1367 as the state and federal claims derive from a common nucleus of

operational facts and are such that the Plaintiff would ordinarily be expected to try them all in a

single judicial proceeding.

14.     Venue is in this Court pursuant to 28 U.S.C. §1391.  28 U.S.C. § 1391(b)
provides:

> A civil action wherein jurisdiction is not founded solely on diversity
> of citizenship may, except as otherwise provided by law, be brought
> only in (1) a judicial district where any defendant resides, if all defendants
> reside in the same State, . . .

Defendant UAMS, and individual defendants reside in Little Rock, Arkansas where this court
sits.

15.     Defendants, as a state agency and as individual agents of the state are not immune
under the Eleventh Amendment from suit or liability for discriminatory hiring practices for Title
VII violations.  See *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666 (1976); *Okruhlik v.
University of Arkansas Ex Rel. May*, 255 F.3d 615 (8th Cir. 2001) (Defendants filed an
Interlocutory Appeal from the District Court ruling denying defendant's motion to dismiss
holding that states are not immune from suit under the Eleventh Amendment for Title VII
violations. The Eighth Circuit decision affirmed the lower court holding and a mandate was
issued on August 30, 2001. This case is set for trial for September 23, 2002 on the merits in the
U.S. District Court Western District of Arkansas.); *Maitland v. University of Minnesota,* 260
F.3d 959 (8th Cir. 2001); *Winbush v. State of Iowa,* 66 F.3d 1471 (8th Cir. 1995). Defendants Dr.
Kevin Means, Dr. David Neale, Dr. Florian Keplinger, Dr. Alice Fann, Dr. Jagdish
Karamchandani, and Dr. Jenness Courtney are also not immune from suit for violations of the
Arkansas Civil Rights Act due to their willful, malicious, deliberate and knowing violation of
Plaintiff's constitutional rights and for their act of malice for their willful discriminatory practice
of failing to hire Plaintiff solely due to Plaintiff's race, national origin and sex and for the
malicious pattern of discrimination against hiring Caucasian males in the PM&R residency
program. See *Robinson v. Langdon,* 333 Ark. 662, 970 S.W.2d 292 (1998).

16.    Plaintiff filed a charge alleging the acts of discrimination more particularly set forth herein on March 31, 2000 with the Equal Employment Opportunity Commission (EEOC).

17.    The EEOC issued Plaintiff a Notice of Right to Sue dated October 31, 2001.  A copy is attached as Exhibit 2.

## III.    NATURE OF THE ACTION AND RELIEF SOUGHT

18.    This is an action by Plaintiff, a Caucasian male doctor of American national origin, to redress the injuries suffered as a result of discriminatory treatment with respect to seeking employment and educational opportunities with the UAMS.  Plaintiff was discriminated against solely due to his race, national origin and sex by defendants in refusing to accept his application for educational opportunities and employment.  Plaintiff was also retaliated against after he attempted to assert his rights to equal consideration for educational opportunities and employment by sending a letter to Chancellor Ward informing him of the initial discriminatory treatment by Defendant Dr. Means.

19.    Plaintiff seeks equitable, declaratory and injunctive relief with respect to his rights to educational and employment opportunities, and compensatory and punitive damages.  Plaintiff further seeks his costs, including attorney's fees, and expenses of litigation.

## IV.    STATEMENT OF FACTS

### A.    INDIVIDUAL DISCRIMINATION AGAINST DR. JEFFREY DALE RAINBOLT, M.D. SOLELY ON ACCOUNT OF RACE, NATIONAL ORIGIN AND SEX

20.    Plaintiff, as a licensed medical doctor with over twelve (12) years experience at the time, sought employment and educational opportunities with UAMS for two positions. The first position was as a first year resident in the Physical Medicine & Rehabilitation (PM&R) Residency Program. The second position was for a second year PM&R Residency Program

position. The first year position is the full program, the second year position allows the

physician to skip the first year where the physician has previously completed an internship.

There were multiple slots available for the first year PM&R position.

21.    Plaintiff initially inquired about the second year residency position with

Defendant UAMS.  Inquiry was made on October 4, 1999 by oral inquiry to a Dr. Brown of the

PM&R Department at UAMS.  Plaintiff was told by Dr. Brown that interviews were under way

and directed him to contact the Residency Program Coordinator, Ms. Luster.  The same day

Plaintiff notified Ms. Luster by both voice mail and a written letter that Plaintiff wished to apply

for a residency position at UAMS.  On October 9th, 1999 Plaintiff received a letter stating that

the deadline for applications was November 15, 1999.

22.    The published deadline for submitting applications for both the first and second

year PM&R Residency Positions were November 15, 1999.

23.    On October 15, 1999 Plaintiff went to the office of Defendant Dr. Kevin Means,

the Chairman of the Department of PM&R and Director of its Residency Program.  Plaintiff

asked to meet with Dr. Means about his application.  As Chairman of the PM&R Residency

Program, Dr. Means is primarily responsible for interviewing, coordinating and selecting

applicants for the residency positions.  At this October 15 meeting in inquiring about

employment, Plaintiff asked Dr. Means if he could submit an application and be considered for

both the first and second year residency positions in the PM&R Residency Program.  Dr. Means

refused to accept Plaintiff's application for the second year position.  After Defendant gave

several excuses for not accepting Plaintiff's application, Plaintiff asked an additional time to just

be considered for the positions.  To this Defendant Dr. Means replied "no" he would not consider

Plaintiff for employment for the residency positions despite the fact that the published application deadline was more than a month away.

24.     Defendant Means offered several conflicting reasons for not considering Plaintiff for the positions.  One reason was that UAMS "strongly" recruits minorities and physicians from foreign countries. Plaintiff alleges that Dr. Means' refusal to consider Plaintiff's application was solely due to his race, national origin and sex.

25.     Dr. Means also gave several other conflicting excuses to Plaintiff for not considering his application.  Dr. Means said that he was under pressure from other departments, and in one case, under pressure to offer the only available position in the second year residency to an individual that was a spouse of another UAMS doctor.  Dr. Means said that it would not be fair to the other applicants to consider Plaintiff because he promised other applicants a "quick answer."  Defendant Means also stated that he intended to hire an individual from the Republic of India.  It was not clear whether the individual from the Republic of India was the spouse of another UAMS employee, but may have been.  Defendant Means refused to accept Plaintiff's application for a second year position and stated he would not be considered even if Plaintiff submitted one for a first year position either.  Defendant Means told Plaintiff the selection meeting was only three days away in another attempt to discourage Plaintiff from submitting an application. The selection meeting Dr. Means was referring to actually took place 13 days later, weeks before the application submission deadline of November 15, 1999.  All of these reasons offered by Defendant Means were mere pretexts for illegal discrimination and Plaintiff was not considered for employment with UAMS solely due to his race, national origin and sex in violation of Title VII of the Federal Civil Rights Act.

26.     Despite Defendant Means refusal to accept Plaintiff's employment application and attempt to discourage Plaintiff from making a submission, Plaintiff nevertheless tendered his application for both the first and second year PM&R residency positions to the office of Ms. Luster.  Plaintiff's completed application was submitted on October 25, 1999 and was documented by UAMS to have been completed on November 4, 1999.  Plaintiff submitted his application before the published deadline of November 15, 1999.  Plaintiff also submitted his employment application via the internet Electronic Residency Application Service before the UAMS November 15, 1999 application submission deadline.

27.     After this meeting with Defendant Dr. Means, Plaintiff was concerned by Defendant Dr. Means discriminatory treatment and was afraid that he would indeed not be considered for the positions just as Dr. Means told Plaintiff.  Concerned by Dr. Means discriminatory treatment of Plaintiff, Plaintiff sent a certified letter of complaint to the UAMS Chancellor, Dr. Ward, informing him of Dr. Means refusal to accept Plaintiff's application, Defendant Means' premature closure of the interview process before the November 15, 1999 application deadline, and Defendant Means' comments about his preference for hiring foreign medical graduate minority applicants and the general discriminatory nature of Dr. Means' remarks.  Chancellor Ward responded by letter stating that he had passed the matter on to Dean Wilson.

28.     Only after writing a letter of complaint to Chancellor Dr. Ward was Plaintiff offered any interview for the residency program.  Defendants will contend that the letter to Chancellor Ward resolved the problem, and at this point, Plaintiff was allowed to commence the normal interview process.  As described in more detail below, this was not the case. During the interview process, the interviewers ranged from being either uncooperative with Plaintiff to

being personally hostile and negative towards Plaintiff.  Plaintiff's treatment during the interview

process was retaliation against Plaintiff for writing a letter of complaint to Chancellor Ward

voicing concerns about his initial discriminatory treatment and an attempt to discourage Plaintiff

from applying for the positions with UAMS.

29.     In another retaliatory action against Plaintiff, Defendant Dr. Means failed to

submit Plaintiff's name to the National Residence Matching Program (NRMP) computer system

for the job match as Plaintiff's experience and qualifications would otherwise have required.  The

NRMP computer system is used during the hiring process at UAMS. This action by Defendant

Dr. Means of not entering Plaintiff in the NRMP computer system prevented Plaintiff from being

ranked with the other applicants.  This omission was indicative of an effort to generate a pretext

for not hiring Plaintiff, because Plaintiff "did not rank."  Plaintiff could not possibly match with a

job if Plaintiff was not entered into the matching program computer system.

30.     Defendants Dr. David Neale, Dr. Florian Keplinger, Dr. Alice Fann, Dr. Jagdish

Karamchandani, Dr. Jenness Courtney as members of the resident selection committee (RSC)

acted in their official and individual capacities in discriminating against Plaintiff by using race,

national origin, and sex in making their determinations for selecting applicants for the residency

positions.  The RSC also specifically excluded Plaintiff from consideration from the residency

positions solely on account of his race, national origin and sex.  The RSC also did not consider

Plaintiff for the positions in retaliation for Plaintiff submitting a letter to the Chancellor

informing him of his discriminatory treatment towards Plaintiff in refusing to accept his

application.

31.     Defendants Dr. Neale, Dr. Keplinger and Dr. Karamchandani, as the three

interviewers of Plaintiff, took retaliatory action against Plaintiff during the interview process by

either being completely non-cooperative with Plaintiff or by being overtly hostile towards

Plaintiff in an attempt to discourage Plaintiff from seeking employment and further educational

opportunities with Defendants.

32.     On February 10, 2000 Plaintiff was interviewed by Dr. Neale.  Dr. Neale made it

apparent that he was merely going through the motions of an interview in an attempt to thwart

any attempts by Plaintiff to assert his rights under Title VII from being discriminated against on

the account of his race, national origin and sex.

33.     Plaintiff was interviewed next by Dr. Keplinger, a female of Phillipino descent.

Dr. Keplinger was extremely hostile and negative, by making negative comments about Plaintiff

being overweight.  Dr. Keplinger commented negatively on every query and remark Plaintiff

made during this second interview.  Dr. Keplinger's negativity continued by stating that Plaintiff

did not seem to be someone who would be interested in PM&R, and that this program would not

be right for Plaintiff, because this was a general program and was not focused on "Sports

Medicine".  Plaintiff's stated that he was very interested in a general program.  Dr. Keplinger at

this point made a negative comment to every point Plaintiff attempted to make regarding his

experience, skills and interests in the program.  Dr. Keplinger became even more hostile,

terminated the interview in the middle of Plaintiff's sentence, made an angry face, blew out air

like a hiss to show exasperation and contempt and jumped up out of her seat with a sweeping

gesture with one arm and simultaneously terminated the interview.  Dr. Keplinger then stated

with her back to Plaintiff curtly that "the interview was over."  Dr. Keplinger's attitude reflected

hostile retaliation due to Plaintiff's initial letter of complaint to Chancellor Ward against Dr.

Means and his discriminatory attitude towards Plaintiff.

34.     Plaintiff was next interviewed by Dr. Karamchandani, an Asian Indian male. Although not as hostile as Dr. Keplinger during Plaintiff's second interview, Dr. Karamchandani also seemed disinterested in the interview and acted as if he was required to just go through the routine of the interview process to possibly thwart any subsequent claim Plaintiff may raise against UAMS due to being discriminated against.  Plaintiff asserts that the general treatment during the interview process reflected a retaliatory effect from Plaintiff's letter of complaint voicing concern of Dr. Means discriminatory nature towards Plaintiff.  Defendant's Fann and Courtney did not interview Plaintiff.  Nevertheless, the conduct of Defendants Means, Neale, Keplinger, and Karamchandani are attributable to these defendants by virture of their RSC member ship.

**B.      PATTERN OF DISCRIMINATION AGAINST CAUCASIAN MALES AND THOSE OF AMERICAN NATIONAL ORIGIN AT THE UAMS DEPARTMENT OF PHYSICAL MEDICINE AND REHABILATATION**

35.     Since 1997, the year Defendant Dr. Means became the Chairman of the Department of PM&R and its Residency Program for UAMS, he and his department have carried out a pattern of discrimination against Caucasian males and those of American National Origin in hiring for residency positions.  As Chairman of the Department of the PM&R and its Residency Programs, Dr. Means is primarily responsible for supervising the selection and hiring process for UAMS residency positions.  Dr. Means therefore is in a position to exert considerable influence over who is hired for the residency positions.

36.     Dr. Means himself has stated that prior to 1997, the year he took the position, the candidates for the residency program were pre-dominantly white males, implying that Dr. Means began taking discriminatory action against Caucasian males once he became the Chairman of the program.  Subsequent to year 1997 a pattern of discrimination against Caucasian males and

persons of American National Origin began at UAMS Department of PM&R due to Dr. Means control of the hiring process and his subjective intent to purposefully discriminate against Caucasian males and "strongly" recruit minorities and foreign born physicians.

37.     Dr. Means has also stated that the UAMS PM&R Department increases recruitment for U.S. born minorities.

38.     The applicants that were hired by UAMS for the contested residency positions in PM&R during years 1999-2000 for which Plaintiff Dr. Rainbolt applied were substantially all either foreign born or minority applicants.  UAMS engages in a pattern of discrimination against Caucasian males and persons of American National Origin in selecting applicants for its PM&R residency programs.  Out of eleven (11) doctors hired over the last 3 years, only one Caucasian male of American National Origin was hired.  This is a less than 10% representation of Caucasian males for the makeup of the residency positions.  Caucasians make up 80% of the population in Arkansas according to the 2000 Census Bureau.  A hiring practice allowing less than 10% of positions to be filled by Caucasian males is strongly disproportionate to the population make up of Arkansas, is counter-intuitive, and impractical of accomplishing without discrimination.  This apparent disproportionality is some evidence that Defendants have engaged in a pattern of discrimination against Caucasian male applicants of American National Origin for the UAMS PM&R Residency Programs.  Plaintiff also alleges that this same pattern occurred every year since 1997, the year Dr. Means became Chairman of the program.  Coupled with the comments of Dr. Means, the conduct of other RSC members, the counter-intuitive national origin, race and sex disproportionate hiring results the past five (5) years shows a pattern of discrimination that is obvious, blatant, and illegal.

39.     While Plaintiff applauds efforts by UAMS to consider foreign born physicians and minorities for PM&R Residency positions, Plaintiff believes that this should not be done in a blatantly discriminatory manner that systematically excludes Caucasian males of American National Origin in the hiring process, as Defendants have engaged in the past five (5) years.  No affirmative action program, nor formal Treaty with other nations justifies the materially disproportional inclusion of minority and foreign applicants in UAMS's PM&R program.  Undue discrimination was and is the cause for the Plaintiff's damages as more specifically detailed in section X herein.

**V.      VIOLATIONS OF LAW**

**COUNT I.  FEDERAL CLAIMS**

**A.   VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT; 42 U.S.C §§ 1981a, 1983, 1985(3), 1997d, 2000c-8 and 2000e-2; DISCRIMINATION ON ACCOUNT OF PLAINTIFF'S RACE, NATIONAL ORIGIN AND SEX AND ILLEGAL RETALIATION**

40.     42 U.S.C. § 1981a of Title VII of the Civil Rights Act provides:

**Damages in cases of intentional discrimination in employment**

**(a)  Right of recovery**

**(1)  Civil rights**

In an action brought by a complaining party under section 706 or 717 of the Civil Rights Act of 1964 (42 U.S.C. 2000e-5) [42 U.S.C.A. §§ 2000e-5 or 2000e-16] against a respondent who engaged in unlawful intentional discrimination (not an employment practice that is unlawful because of its disparate impact) prohibited under section 703, 704, or 717 of the Act (42 U.S.C. 2000e-2 or 2000e-3) [42 U.S.C U.S.C.A. §§§ 2000e-2, 2000e-3, or 2000e-16], and provided that the complaining party cannot recover under section 1981 of this title, the complaining party may recover compensatory and punitive damages as allowed in subsection (b) of this section, in addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964 [42 U.S.C.A. § 2000e-5(g)], from the respondent.

41.     42 U.S.C. § 1983 of Title VII of the Civil Rights Act provides:

**Civil action for deprivation of rights**

Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42.     42 U.S.C. § 1985(3) of the Civil Rights Act provides:

**Conspiracy to interfere with civil rights**

**(3) Depriving persons of rights or privileges**

If two or more persons in any State or Territory conspire, or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

43.     42 U.S.C. § 2000c-8 of Title VII of the Civil Rights Act provides:

**Personal suits for relief against discrimination in public education**
Nothing in this subchapter shall affect adversely the right of any person to sue for or obtain relief in any court against discrimination in public education.

44.     42 U.S.C. § 2000e-2 of Title VII of the Civil Rights Act provides:

> **Unlawful employment practices**
> **(a)  Employer practices**
> It shall be an unlawful employment practice for an employer
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to
> discriminate against any individual with respect to his compensation, terms,
> conditions, or privileges of employment, because of such individual's race, color,
> religion, sex, or national origin; or
> (2)  to limit, segregate, or classify his employees or applicants for employment in
> any way which would deprive or tend to deprive any individual of employment
> opportunities or otherwise adversely affect his status as an employee, because of
> such individual's race, color, religion, sex, or national origin. . . .
> **(m)     Impermissible consideration of race, color, religion, sex, or national**
> **origin in employment practices**
> Except as otherwise provided in this subchapter, an unlawful employment
> practice is established when the complaining party demonstrates that race, color,
> religion, sex, or national origin was a motivating factor for any employment
> practice, even though other factors also motivated the practice. . . .

45.     Defendants have violated the above federal laws and have discriminated against

Plaintiff solely due to his race, national origin and sex as enumerated in factual detail in

paragraphs 1 through 39 above which Plaintiff repeats and realleges as though fully set forth

here.

46.     42 U.S.C. § 1997d of the Federal Civil Rights Act provides:

> **Prohibition of retaliation**
>
> No person reporting conditions which may constitute a violation under this
> subchapter shall be subjected to retaliation in any manner for so reporting.

47.      Subsequent to Plaintiff having written a letter to the Chancellor of UAMS, Dr.

Ward, the Defendants Dr. Kevin Means, Dr. David Neale, Dr. Florian Keplinger, Dr. Alice Fann,

Dr. Jagdish Karamchandani, and Dr. Jenness Courtney took retaliatory actions against the

Plaintiff including maliciously and purposely not placing Plaintiff's name in the NRMP computer

system for the match and conducting generally hostile interviews with Plaintiff in an attempt to

discourage Plaintiff from seeking employment with UAMS as enumerated in factual detail in paragraphs 1 through 39 above.

48.     All named Defendants, in their official capacity and/or individual capacity, engaged in the above alleged conduct under the color of state law which proximately caused the violation of Plaintiff's federally protected rights.

49.     Defendant UAMS ratified the conduct of the individual Defendants.

50.     The purpose of the anti-retaliation provisions of the Federal Civil Rights Act is to ensure that employees are not "chilled" from exercising their rights.  To allow Defendants retaliatory efforts to discourage Plaintiff from seeking employment with UAMS violates the letter and intent of the anti-retaliation provisions.

**B.     14th AMENDMENT DUE PROCESS**

51.     Plaintiff realleges and incorporates paragraphs 1 through 39 as if fully set out here.

52.     Plaintiff had a reasonable expectation of receiving fair and equitable treatment during the interview process at UAMS in accordance with the 14th Amendment to the Constitution.  Defendants violated Plaintiff's 14th Amendment rights to due process in their actions.

53.     All named Defendants, in their official capacity and/or individual capacity, engaged in the above alleged conduct under the color of state law which proximately caused the violation of Plaintiff's federally protected rights proximately causing damages as stated below.

54.     Defendant UAMS ratified the conduct of the individual defendants.

**COUNT II.   STATE LAW CLAIMS**

> **A.     VIOLATION OF THE ARKANSAS CIVIL RIGHTS ACT
> ARK. CODE ANN. §§ 16-123-101 ET SEQ. (ACRA)**

55.    Plaintiff repeats and realleges paragraphs 1 through 39 as though fully set forth here.

56.    Ark. Code Ann. § 16-123-105 provides:

(a)  Every person who, under color of any statute, ordinance, regulation, custom, or usage of this state or any of its political subdivisions subjects, or causes to be subjected, any person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Arkansas Constitution shall be liable to the party injured in an action at law, a suit in equity, or other proper proceeding for redress.
(b)  In the discretion of the court, a party held liable under this section shall also pay the injured party's cost of litigation and a reasonable attorney's fee in an amount to be fixed by the court.
(c)  When construing this section, a court may look for guidance to state and federal decisions interpreting the federal Civil Rights Act of 1871, as amended and codified in 42 U.S.C. § 1983, as in effect on January 1, 1993, which decisions and act shall have persuasive authority only.

57.    Ark. Code Ann. § 16-123-107 provides:

Discrimination offenses
(a)  The right of an otherwise qualified person to be free from discrimination because of race, religion, national origin, gender, or the presence of any sensory, mental, or physical disability is recognized as and declared to be a civil right. This right shall include, but not be limited to:
(1)  The right to obtain and hold employment without discrimination;. . . .

58.    Defendants have violated the above state laws and have discriminated against Plaintiff solely due to his race, national origin and sex as enumerated in factual detail in paragraphs 1 through 39 above which Plaintiff repeats and realleges as though fully set forth here.

59.    The Defendants failure to grant Plaintiff educational and employment opportunities was in violation of his rights secured by the Arkansas Civil Rights Act. The Defendants were motivated by Plaintiff's race, national origin and sex in making an employment decision against him, which is illegal under the ACRA. As discussed in factual detail in

paragraphs 1 through 39 above, Defendants initially refused to accept Plaintiff's employment

application and consider Plaintiff for any of the residency positions solely due to his race,

national origin and sex in a malicious disregard for Plaintiff's constitutional rights.

60.    Ark. Code Ann. § 16-123-108 of the ACRA provides:

**Retaliation-Interference-Remedies**

(a) Retaliation.  No person shall discriminate against any individual because such
individual in good faith has opposed any act or practice made unlawful by this subchapter
or because such individual in good faith made a charge, testified, assisted, or participated
in any manner in an investigation, proceeding, or hearing under this subchapter.

61.    Defendants purposefully and *maliciously* retaliated against Plaintiff after he

sought to protect his rights when he submitted a letter of complaint to Chancellor Ward of

UAMS voicing concerns of Plaintiff's initial discriminatory treatment by Defendant Dr. Means

as discussed above.

**B.    INTENTIONAL INFLICTION OF EMOTIONAL
          DISTRESS/OUTRAGE**

62.    Plaintiff repeats and realleges paragraphs 1 through 39 above as though fully set

forth here.

63.    The acts described in the preceding paragraphs constitute intentional infliction of

emotional distress and outrage, in violation of the common law of the State of Arkansas.

64.    Defendants Dr. Means, Dr. Neale, Dr. Keplinger, Dr. Fann, Dr. Karamchandani

and Dr. Courtney have acted intentionally and/or recklessly toward Plaintiff.

65.    The conduct of Defendants Dr. Means, Dr. Neale, Dr. Keplinger, Dr. Fann, Dr.

Karamchandani and Dr. Courtney toward Plaintiff was extreme and outrageous for a person of

Plaintiff's stature, position, professionalism. These actions resulted in the Plaintiff suffering

extreme mental anguish and emotional distress, which has manifested itself in many ways such

as lowered mood, sleeplessness, loss of self-esteem, loss of self-confidence, lack of direction, humiliation, embarrassment, loss of personal and professional reputation, loss of professional experience and educational opportunities, and loss of ability to prepare himself for Board Certification.

### C.    INTERFERENCE WITH EMPLOYMENT

66.    Plaintiff repeats and realleges paragraphs 1 through 39 above as though fully set forth here.

67.    Defendants Dr. Means, Dr. Neale, Dr. Keplinger, Dr. Fann, Dr. Karamchandani and Dr. Courtney have intentionally interfered with Plaintiff's business relationship with UAMS by intentionally failing to accord Plaintiff fair and equitable treatment, free from discrimination.

68.    Defendants Dr. Means, Dr. Neale, Dr. Keplinger, Dr. Fann, Dr. Karamchandani and Dr. Courtney have also interfered with Plaintiff's employment opportunities with UAMS by creating a pervasive hostile environment during the application, interview and review process, with intent and design to prevent Plaintiff from acquiring a position in the UAMS PM&R Residency program.

## VI.    DENY DEFENDANTS' PRETEXTUAL REASONS

69.    Defendants will contend that Plaintiff was not discriminated against and was not refused to submit his employment application at the initial October 15 interview with Defendant Dr. Means.  Defendant Dr. Means will contend that Plaintiff went away from this October 15 meeting satisfied with Plaintiff being able to submit an application.  This is false.  If Plaintiff went away from the initial interview satisfied that he was able to submit his application, he would not have sent a letter of complaint to Chancellor Ward voicing his concerns of

discrimination by Defendant Means by Means refusing to accept his application due to Plaintiff's race, national origin and sex.

70.     Defendants will contend that Plaintiff was not hired for his failure to be ranked in the UAMS NRMP computer match system and that his general qualifications were not sufficient. Plaintiff contends that he was not ever placed in the NRMP computer system so it would not be possible for Plaintiff to match.  This is evidenced by an internal UAMS document which states that: "Applicant was not ranked in 2000 Resident Match List."

71.     This failure to place Plaintiff in the computer system is also evidence that Plaintiff's employment application was completely ignored solely due to Plaintiff's race, national origin and sex.  Defendant Dr. Means made it clear from the outset that Plaintiff's application would not be considered at all.  At the conclusion of the October 15 meeting Plaintiff asked Defendant Dr. Means if he would simply consider Plaintiff for the position.  Defendant Means stated "no."

72.     Defendant Dr. Means made numerous attempts to discourage Plaintiff from even submitting an application.  Defendants Dr. David Neale, Dr. Florian Keplinger, and Dr. Jagdish Karamchandani, made numerous attempts in the interviews they conducted with Plaintiff to discourage Plaintiff from continuing in the application process.  This is evidenced by the numerous excuses given to Plaintiff why Defendant Means would not consider Plaintiff's application.  This is also evidenced by the hostile manner the Defendant interviewers took when interviewing Plaintiff.  Based on these facts, Plaintiff asserts that Defendant's claim of failure to hire due to Plaintiff not ranking in the NRMP computer match system is a mere pretext and that the true reason for Defendant's failure to hire Plaintiff was its pattern of discriminating against

males of Caucasian race and persons of American National Origin and its efforts to "strongly" recruit minorities and foreigners.

73.    Defendants may also contend that Plaintiff was not hired because of average grades, letters of reference from Physicians that worked with Plaintiff several years in the past (not recent) and average evaluations from Plaintiff's internship. All of these reasons are also pretextual, because Defendants never even considered Plaintiff for employment solely due to his race, national origin and sex, and it is impossible to determine Plaintiff's relative ranking since he was omitted from inclusion in the NRMP computer match analysis.

## VII.    EXHAUSTION OF ADMINISTRATIVE REMEDIES

74.    Plaintiff filed a Charge of Discrimination against the Defendants with the United States Equal Employment Opportunity Commission (EEOC) charging Defendants with the acts of discrimination indicated in paragraphs 9 through 41 of this Complaint on March 31, 2000.

75.    After investigation, the Equal Employment Opportunity Commission issued Plaintiff a Notice of Right to Sue dated October 31, 2001.

76.    Plaintiff by filing a Charge of Discrimination with the EEOC and subsequently being issued his Notice of Right to Sue has therefore exhausted his administrative remedies and his suit is ripe for trial in a federal district court with appropriate jurisdiction.

## VIII.   PLAINTIFF'S MITIGATION OF DAMAGES

77.    Plaintiff has also mitigated his damages by continuing to seek employment and by sending out numerous resumes and employment applications over the past 3 years. Plaintiff currently takes contract jobs and is currently working at the employment he is able to find. The employment Plaintiff is currently performing is that of very low income and is limited compared to Plaintiff's potential if Plaintiff had been allowed to enroll in the PM&R residency and go on to

become board certified. Plaintiff's lack of opportunity to become board certified is due to Defendants' discrimination against Plaintiff. Plaintiff can only become board certified after completing the residency positions Plaintiff sought with Defendants.

## IX.   JURY DEMAND

78.   Plaintiff hereby demands a jury trial on all issues addressed in this Complaint.

## X.   DAMAGES

79.   Plaintiff repeats and realleges paragraphs 1 through 37 above as though fully set forth here.

80.   Because of the actions of Defendants, Plaintiff has suffered loss of income, out of pocket expenses, and extreme mental anguish and emotional distress, which has manifested itself in many ways such as lowered mood, sleeplessness, loss of self-esteem, loss of self-confidence, lack of direction, humiliation, embarrassment, loss of personal and professional reputation, loss of professional experience and educational opportunities, loss of ability to prepare himself for Board Certification.

81.   The PM&R residency programs allow the resident Physicians to sit for Board Certification exams after the completion of the residency. Defendant's failure to hire Plaintiff and offer Plaintiff a residency position precludes and restricts Plaintiff's present and future educational and employment opportunities. Substantially all hospitals, medical facilities and employers of physicians in Arkansas require Board Certification in areas of specialization. Board Certification requires an applicant to sit for the certification examination after the completion of a residency program. Plaintiff therefore, without Board Certification, cannot have any positive expectation of future employment in his profession. UAMS is the only institution in the State of Arkansas which offers an appropriate residency program that has training for Board

Certification. This failure to hire Plaintiff for the residency program harms Plaintiff more than mere compensation for the four years Plaintiff would have been employed in the program. The discrimination effectively prevents Plaintiff from obtaining short, medium, or long-term gainful employment in the medical field in Arkansas. This element of loss of future employment opportunities also causes Plaintiff to suffer damages in excess of the mere amount of compensation Plaintiff would have received just from the PM&R residency salary.

82.     Plaintiff seeks compensatory damages from the individual Defendants for injuries suffered in violation of Plaintiff's rights to be free from discrimination and retaliation and in violation of his substantive and procedural due process rights as an applicant to the UAMS PM&R Residency programs under Title VII.

83.     Plaintiff seeks declaratory relief and prospective injunctive relief from UAMS for violations of his right to be free from discrimination and retaliation and for violations of his substantive and procedural due process rights as an applicant to the UAMS PM&R residency programs under Title VII including supervisory inclusion in the PM&R residency program Plaintiff sought entry to.

84.     Plaintiff seeks compensatory damages from the individual Defendants named in their individual capacities for injuries caused by Defendants under Arkansas law, including but not limited to violations of the Arkansas Civil Rights Act with regard to his employment in the UAMS PM&R Residency Programs. Plaintiff also seeks punitive damages for the intentional wrongful actions of the Defendants.

85.     Plaintiff seeks his costs of court, including litigation expenses, expert witnesses fees, and reasonable attorneys fees from the defendants, jointly and severally, for all of his causes of action.

86. For all of the above, Plaintiff seeks damages in an amount sufficient to compensate him for damages sustained, which amount is in excess of the jurisdictional amount exclusive of interest and costs.

## XI. PRAYER FOR RELIEF

I. As relief for the above described violations, Plaintiff requests that this Court:

A. Grant a declaratory judgment stating that the actions taken against Plaintiff were discriminatory in violation of Title VII of the Federal Civil Rights Act and the Arkansas Civil Rights Act, and in violation of the anti-retaliation provisions of both acts;

B. Grant declaratory judgment stating that Defendants' actions constituted intentional infliction of emotional distress, outrage and improperly interfering with his employment and educational opportunities in the UAMS PM&R Residency Programs.

C. Enjoin the Defendants from engaging in further unlawful conduct and order such affirmative action for Plaintiff and/or changes in policies and procedures within the University System as may be appropriate including allowing Plaintiff admittance to the residency programs described herein with appropriate equitable safeguards favoring Plaintiff to prevent further subjective, overt discrimination against him;

D. Award Plaintiff back pay, interest on back pay, vacation pay and any other applicable benefits from July 2000 through the date of judgment and to include all fringe benefits;

E. Award Plaintiff appropriate front pay;

F. If punitive damages are allowable under Title VII against a quasi-governmental entity; award Plaintiff punitive damages in excess of $300,000 and compensatory damage in excess of $300,00 from the Defendant UAMS for Plaintiff's Title VII and Due Process claims,

G.   Award Plaintiff compensatory damages in excess of $300,000 for Plaintiff's federal and state law claims for pecuniary losses, emotional pain and suffering, inconvenience, mental anguish, and the loss of future employment opportunities due to Defendant's failure to hire Plaintiff thus not giving Plaintiff the opportunity to sit for board certification which most if not all employers of physicians require;

H.   Award Plaintiff punitive damages in excess of $300,000 from the Defendants named in their individual capacities for his state law claims;

I.   Award Plaintiff nominal damages, compensatory, and punitive damages for all remaining wrongful conduct of the defendants jointly and severably;

J.   Award Plaintiff pre and post judgment interest;

K.   Award judgment against Defendants jointly and severally for pre-judgment interest, post-judgment interest, attorneys' fees, costs and litigation expenses and such sums as will make him whole for the unlawful and unconstitutional actions perpetrated against him;

L.   Award Plaintiff all Equitable and Injunctive relief appropriate by bi-furcating the remedy phase of the proceeding as to allow the court to fashion appropriate injunctive relief while leaving the jury left to decide all monetary damages.

M.   Plaintiff also requests that the Court grant such other relief, including costs and attorney fees under both federal and state law as may be appropriate, including injunctive orders and for such other and further relief that this Court may deem just, proper and equitable.

WHEREFORE, Plaintiff prays that his complaint be granted and that he be awarded the relief requested herein.

Respectfully submitted,

ZACHARY DAVID WILSON, P.A.

By:

Zachary David Wilson
Arkansas Bar No. 73130
321 North Maple Street
Post Office Box 5578
North Little Rock, AR  72119
(501) 376-4090
(501) 376-4491 Fax
Attorney For Plaintiff

VERIFICATION
STATE OF ARKANSAS}
                            }SS
COUNTY OF PULASKI}

I, Jeffrey Dale Rainbolt, state on oath that the statements and information contained in the foregoing Complaint are true and correct to the best of my knowledge, information, and belief.

IN WITNESS WHEREOF, I have hereunto set my hand this 29th day of January, 2002.

JEFFREY D. RAINBOLT M.D.

SUBSCRIBED AND SWORN TO before me, a Notary Public, within and for the State and County aforesaid, duly commissioned, qualified, and acting, this 29th day of January, 2002.

NOTARY PUBLIC

MARY H. FRANCIS
NOTARY PUBLIC
SEPT. 24, 2011
COMMISSION EXPIRATION
PULASKI CO. ARKANSAS

My Commission Expires: 10-12-2011

(C-7137) - Rainbolt, Jeffrey Dale, M.D.                                          Page 1 of 2



## Detailed License Verification

**Queried By: Donna Thomas / Arkansas State Medical Board, Little Rock, AR**
**Thursday, January 24, 2002 - 3:24:23 PM Local Time**

Date of last database update: Thursday, January 24, 2002 - 3:12:13 PM

## General Information

**Name:** Rainbolt, Jeffrey Dale, M.D.
**DOB:** 11/3/1958
**Specialty:** General Practice

## Address Information

**Mailing Address:** PO Box 1009
Marshall AR,  72650
(870) 448-2326

## License Information

**License Number:** C-7137
**Original Issue Date:** 8/8/1986
**Expiration Date:** 11/30/2002
**Status Year:** 2001
**License Status:** Active
**License Category:** Unlimited

## Board History



**EXHIBIT**
tabbies®
**1**

(C-7137) - Rainbolt, Jeffrey Dale, M.D.                                   Page 2 of 2

**Appearance:  No**

**Reason:  Complaint**

**Date of Action:  4/22/1988**

**Minutes:**
Case #16 - After thorough discussion motion was made by Dr. Lytle and seconded by Mr. Currie
that no action be taken and for the Secretary to write this physician a letter. Motion carried.

SN: ASMB

v1.0705.001
ASMB4436



**State of Arkansas**
MEDICAL BOARD
2100 Riverfront Drive
Little Rock, AR 72202

Registration Year:  2001          Active/Unlimited

No.: C-7137      Issued:  8/8/1986      Expires: 11/30/2002
    Jeffrey Dale Rainbolt, M.D.
    PO Box 1009
    Marshall, AR 72650

This is to certify that the above person has paid
the license registration fee for the year indicated.

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

# DISMISSAL AND NOTICE OF RIGHTS

| To: Jeff Rainbolt<br>P.O. BOX 1019<br>HWY 27 SOUTH<br>MARSHALL, AR 72650 | From: E.E.O.C<br>Little Rock Area Office<br>425 W Capitol Suite 625<br>Little Rock AR 72201 |
|---|---|

☐ *On behalf of a person aggrieved whose identity is CONFIDENTIAL ( 29 C.F.R. 1601.7(a) )*

| Charge Number | EEOC Representative | Telephone Number |
|---|---|---|
| 251A00658 | Johnny L. Glover, Inv. | (501) 324-5060 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability that is covered by the Americans with Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ We cannot investigate your charge because it was not filed within the time limit required by law.

☐ Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

☐ While reasonable efforts were made to locate you, we were not able to do so.

☐ You had 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

☒ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other *(briefly state)* _____

## - NOTICE OF SUIT RIGHTS -

*(See the additional information attached to this form)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed **WITHIN 90 DAYS** of your receipt of this Notice; otherwise, your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit based on this charge, please send a copy of your court complaint to this office.

On Behalf of the Commission

_Kay Klugh by [signature]_          October 31, 2001
Kay Klugh, Director                        *(Date)*

**Enclosure(s)**

cc: U OF A MEDICAL SCIENCE
    4301 WEST MARKHAM
    LITTLE ROCK, AR 72205

**EXHIBIT**

tabbies®

2